Slip Op. 25-17

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ASIA WHEEL CO., LTD., | |
| Plaintiff, | |
| and | |
| TRAILSTAR LLC and LIONSHEAD SPECIALTY TIRE AND WHEEL LLC, | |
| Consolidated Plaintiffs, | |
| and | |
| DEXTER DISTRIBUTION GROUP LLC F/K/A TEXTRAIL, INC., | Before: Gary S. Katzmann, Judge |
| Plaintiff-Intervenor, | Consol. Court No. 23-00096 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| DEXSTAR WHEEL DIVISION OF AMERICANA DEVELOPMENT, INC., | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[ Plaintiffs' Motion for Judgment on the Agency Record is denied.]

Dated: <u>February 21, 2025</u>

<u>Jay C. Campbell</u>, White & Case LLP, of Washington, D.C., argued for Plaintiff Asia Wheel Co., Ltd. With him on the briefs were <u>Walter J. Spak</u> and <u>Chunfu Yan</u>.

Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for Consolidated Plaintiff Trailstar LLC.

R. Kevin Williams, Clark Hill, of Chicago, IL, argued for Consolidated Plaintiff Lionshead Specialty Tire and Wheel LLC.

Nancy A. Noonan, Yun Gao, and Leah N. Scarpelli, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenor Dexter Distribution Group LLC.

Stephen C. Tosini, Senior Trial Counsel, U.S. Department of Justice, Washington, D.C., argued for Defendant the United States. With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director. Of counsel in the briefs were Ian A. McInerney, Senior Attorney, Danielle Cossey, Attorney, and Brishailah Brown, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Nicholas J. Birch, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor Dexstar Wheel Division of Americana Development, Inc. With him on the briefs was Roger B. Schagrin.

Katzmann, Judge: This case arises from the U.S. Department of Commerce's ("Commerce") ruling that certain trailer wheels produced by Asia Wheel Co., Ltd. ("Asia Wheel") fall within the scope of the antidumping and countervailing duty orders on certain steel trailer wheels from the People's Republic of China ("China"). In September 2019, Commerce issued antidumping and countervailing duty orders on certain steel wheels from China covering: "certain on-the-road steel wheels, discs and rims," including "rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China." Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders, 84 Fed. Reg. 45952, 45954 (Dep't Com. Sept. 3, 2019) ("Orders").

In response to Asia Wheel's request for scope proceedings, Commerce determined in a scope ruling that Asia Wheel's steel trailer wheels, manufactured in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country, are subject to the Orders.  See Mem. from E. Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Apr. 11, 2023), P.R. 126 ("Final Scope Ruling").  Plaintiff Asia Wheel, a Thai subsidiary of a Chinese steel wheel manufacturer; Consolidated Plaintiffs Trailstar LLC ("Trailstar"), an American trailer wheel wholesaler, and Lionshead Specialty Tire and Wheel LLC ("Lionshead"), an American trail component contract manufacturer; and Plaintiff-Intervenor Dexter Distribution Group ("Dexter"), an American distributer of trailer parts, (collectively, "Plaintiffs") challenge Commerce's Final Scope Ruling. See Pls.' Am. Mot. for J. on Agency R., Feb. 22, 2024, ECF No. 47 ("Pls.' Br."); Pls.' Reply Br., May 31, 2024, ECF No. 58 ("Pls.' Reply"); Orders, 84 Fed. Reg.; Final Scope Ruling.  Defendant the United States ("the Government") and Defendant-Intervenor Dexstar Wheel Division of Americana Development, Inc. ("Defendant-Intervenor") ask the court to sustain Commerce's determination.  See Def.'s Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., Mar. 8, 2024, ECF No. 48 ("Gov't Br."); Def.-Inter.'s Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., Apr. 5, 2024, ECF No. 52 ("Def.-Inter.'s Br.").

This case presents four issues: (1) whether Commerce impermissibly expanded the scope of the Orders; (2) whether Commerce's determination that Asia Wheel's trailer wheels produced from mixed-origin components were not substantially transformed in Thailand is supported by substantial evidence and in accordance with law; (3) whether Commerce's decision to impose duties on the entire imported trailer wheel is supported by substantial evidence and in accordance with law; and (4) whether importers lacked adequate notice that the trailer wheels produced from

mixed-origin components were covered by the Orders, such that Commerce impermissibly directed U.S. Customs and Border Protection ("Customs") to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry. The court concludes that (1) Commerce did not impermissibly expand the scope of the Orders; that (2) Commerce's determination that Asia Wheel's trailer wheels were not substantially transformed is supported by substantial evidence and in accordance with law; that (3) Commerce's imposition of duties on the entire wheel based on a substantial transformation analysis is supported by substantial evidence and in accordance with law; and that (4) Plaintiffs had sufficient notice that the wheels were covered by the Orders. Therefore, the court denies Plaintiffs' motion and sustains the Final Scope Ruling.

## BACKGROUND

### I. Legal Background

#### A. Antidumping and Countervailing Duties and Scope Determinations

To facilitate fair trade, the Tariff Act of 1930 "permits Commerce to impose two types of duties on imports that injure domestic industries[.]" Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014) (citing 19 U.S.C. §§ 1671(a), 1673). Commerce assesses antidumping duties on foreign goods if it determines that the "merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the U.S. International Trade Commission separately concludes that dumping materially injures, threatens, or impedes the establishment of an industry in the United States. 19 U.S.C. § 1673; see also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017). Similarly, Commerce imposes countervailing duties if it determines that a good is receiving a "countervailable subsidy" from a foreign government. 19 U.S.C. § 1671(a).

The duty orders that Commerce issues must "include[] a description of the subject merchandise, in such detail as [Commerce] deems necessary. . . ." 19 U.S.C. § 1673e(a)(2). Under Commerce's regulations, an interested party may request that Commerce issue a scope ruling to clarify whether a certain article of merchandise is subject to an order. See 19 C.F.R. § 351.225(a).

### B.    Substantial Transformation Analysis

Antidumping and countervailing orders "must specify both the class or kind of merchandise and the particular country from which the merchandise originates." Ugine & Alz Belg., N.V. v. United States, 31 CIT 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007) (citing Certain Cold Rolled Carbon Steel Flat Prods. from Arg., 58 Fed. Reg. 37062, 37065 (July 9, 1993)). In determining country of origin and whether an imported article falls within the scope of an order, Commerce may conduct a substantial transformation analysis. See Bell Supply Co. v. United States, 888 F.3d 1228,1229 (Fed. Cir. 2018) ("Bell Supply IV").[1] The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has affirmed substantial transformation analysis as "a

---

[1] Commerce published revisions to its scope regulations in September 2021, adding a new relevant provision titled "[c]ountry of origin determinations." 19 C.F.R. § 351.225(j)(1). Under the new provision, Commerce "may use any reasonable method" to "determine the country of origin of the product," to ultimately "consider[] whether a product is covered by the scope of the order at issue . . . ." Id. § 351.225(j). The provision goes on to state that "the Secretary may conduct a substantial transformation analysis that considers relevant factors that arise on a case-by-case basis," and includes the factors outlined in Bell Supply IV. Id. § 351.225(j)(1); see also Bell Supply IV, 888 F.3d at 1228–29. While this revision codified the substantial transformation test, the parties agree that because Asia Wheel filed its scope ruling request on November 11, 2020, before the effective date of the new regulations, the pre-revision version of the regulations applies. See Pls.' Br. at 19 n.3; Def.'s Br. at 11 (citing to (k)(1) rather than (j)(1)); see also Scope Ruling Request; Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52300 (Dep't Com. Sept. 20, 2021) ("Amendments to § 351.225 . . . apply to scope inquiries for which a scope ruling application is filed . . . on or after November 4, 2021."). The parties also agree that substantial transformation was relevant in determining whether a product falls within scope even before Commerce's revision of its scope regulations. See Pls.' Br. at 27 (arguing that Commerce applied the wrong standard, but not challenging the use of substantial transformation analysis itself); Def.'s Br. at 16 ("Commerce reasonably decided to apply a substantial transformation analysis to determine country of origin . . . .").

yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (quoting E.I. DuPont de Nemours & Co. v. United States, 22 CIT 370, 373–74, 8 F. Supp. 2d 854, 858 (1998)). The Federal Circuit has explained that if a product:

> originates from a country identified in the order, then Commerce need not go any further. On the other hand, if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in [the] order, then Commerce can include such merchandise within the scope . . . only if it finds circumvention under [19 U.S.C.] § 1677j.

Id. at 1230 (citations omitted). Ultimately, in conducting a substantial transformation analysis, Commerce asks whether "as a result of manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character[,] and use." Id. at 1228 (internal quotation marks omitted) (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). To determine whether substantial transformation has occurred, "Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Id. at 1228–29.

### C.    Customs's EAPA Investigations

The Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018), directs Customs to investigate agency referrals or interested-party allegations that "reasonably suggest[] that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1); see also Diamond Tools Tech. LLC v. United States, 45 CIT __, __, 545 F. Supp. 3d 1324, 1331–32 (2021). If Customs determines that covered merchandise entered the United States through evasion, it will suspend liquidation of unliquidated entries "that enter on or

after the date of the initiation of the investigation . . . ." 19 U.S.C. § 1517(d)(1)(A)(i). If liquidation of entries has already been suspended, then that suspension will continue. See id. § 1517(d)(1)(A)(ii).

EAPA's purpose is to "empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring full collection of [antidumping and countervailing] duties and, thereby, preventing a loss in revenue." Diamond Tools, 45 CIT at __, 545 F. Supp. 3d at 1351. EAPA establishes the procedure for an "interested party" to submit allegations of importer evasion of antidumping and countervailing liability. 19 U.S.C. § 1517(b). Within fifteen days of a filed allegation, Customs will open an investigation. See id. § 1517(b)(1). Within ninety days, Customs must determine whether there is "reasonable suspicion" of evasion, at which point Customs imposes interim measures, including suspension of liquidation. Id. § 1517(e). Next, parties can submit factual information, written arguments, and responses before Customs reaches a final determination.[2] See 19 C.F.R. § 165.23(b), (c)(2); id. § 165.26(a)(1), (b)(1). If Customs cannot make a final determination of evasion, it refers the matter to Commerce through a "covered merchandise referral." 19 U.S.C. § 1517(b)(4)(A); 19 C.F.R. § 351.227(a). Upon receiving the referral, Commerce "shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner." 19 U.S.C. § 1517(b)(4)(B); 19 C.F.R. § 351.227(a).

## II.      *Factual Background*

On September 3, 2019, Commerce issued antidumping and countervailing orders on

---

[2] Customs typically must reach this final determination within 300 days of the initiation of the original investigation, though that timeline can be extended in extraordinarily complicated situations. See 19 U.S.C. § 1517(c)(1).

imports of certain steel trailer wheels from China in response to a petition from Defendant-Intervenor Dexstar. See Orders, 84 Fed. Reg. The trailer wheels subject to the Orders are used on road and highway trailers and on other towable equipment. See id. at 45954. These wheels consist of two components—a rim and a disc—that are welded together.



Description and Flowchart of Production Method A at 4 (Nov. 11, 2020), P.R. 1, 2, C.R. 1, 2, 3, 4, Attach. 4.

> The Orders account for certain types of processing in third countries:
>
> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

Orders, 84 Fed. Reg. at 45954.

During the original investigation, both Plaintiffs, as importers of the steel wheels at issue, and Defendant-Intervenor, as a producer of the domestic like product, sought Commerce's clarification on whether the scope includes steel wheels where only one component—that is, a rim or a disc—originates in China. See Letter from G. De Prest to W. Ross, re: Pet'r's Req. for Clarification of Country of Origin Criteria at 4, Case No. A-570-090, Bar Code: 3798826-01 (Mar. 1, 2019); Letter from W. Spak to W. Ross, re: Jingu's Rebuttal Scope Case Brief at 14–15, Case No. A-570-090, Bar Code: 3841819-01 (May 30, 2019) ("Jingu's Rebuttal Br."); Letter from N.

Marshak to W. Ross, re: TTT's Scope Case Br. at 11–12, Case No. A-570-090, Bar Code: 3837566-01 (May 22, 2019) ("TTT's Br."). Plaintiffs requested explanation and potential language changes to clarify that wheels with only one component from China would not fall within the Orders' scope. See Jingu's Rebuttal Br. at 14–15; TTT's Br. at 11–12. Commerce declined these requests, stating "the current scope language is clear that only if all constituent rim and disc parts to form a steel wheel are from China does the order apply notwithstanding any analysis of substantial transformation." Final Scope Decision Mem. for the Final AD/CVD Determinations at 24 (Dep't Com. July 1, 2019), P.R. 57, C.R. 36, Ex. 1 ("Final Scope Mem."). Commerce also declined to change the language in the Orders from "rims and discs" to "rims or discs," explaining that the word "or" was "selectively expansionary and not consistent with the plain meaning of the word 'and.'" Id. Commerce added during the initial investigation that it would:

> not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern.

Id.

On November 10, 2020, Asia Wheel requested a scope ruling from Commerce asking whether certain models of their wheels produced in Thailand fall under the scope of the Orders. See Letter from White & Case LLP to W. L. Ross, Sec'y of Com., re: Request for Scope Ruling for Asia Wheel's Steel Trailer Wheels (Nov. 10, 2020), P.R. 1, 2, C.R. 1, 2, 3, 4 ("Scope Ruling Request"). Asia Wheel specifically requested rulings on wheels produced through the following three production methods:

- **Production Method A:** Trailer wheels manufactured from Chinese-origin discs and rims produced in Thailand from rectangular steel plates sourced from China.

- **Production Method B:** Trailer wheels manufactured from Thai-origin discs made from circular steel plates from China or a third country and Thai-origin rims made from rectangular steel plates from China or a third country.

- **Production Method C**: "Dual wheels" manufactured using Thai-origin discs made from disc blanks from China and rims from China.

See id. at 6–7.

In response to an evasion allegation by Dextar, Customs initiated an EAPA investigation under 19 U.S.C. § 1517 to determine if mixed-component wheels, such as those manufactured by Asia Wheel, evaded the Orders. See Letter from Customs, re: Notice of Initiation of Investigation and Interim Measures Taken as to Lionshead Specialty Tire and Wheel LLC; TexTrail LLC; and TRAILSTAR LLC Concerning Evasion of the Antidumping and Countervailing Duty Orders on Steel Trailer Wheels from China (CBP July 15, 2020), P.R. 14, C.R. 6, Attach. 1. Customs was unable to determine if these wheels were covered merchandise, and on December 17, 2020 (shortly after Asia Wheel requested a scope ruling), issued a "covered merchandise referral" to Commerce under 19 U.S.C. § 1517(b)(4). Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Notice of Covered Merchandise Referral, 86 Fed. Reg. 10245, 10246 (Dep't Com. Feb. 19, 2021).

In response to Asia Wheel's scope request and the covered merchandise referral, Commerce initiated a scope inquiry on March 22, 2021. See Mem. from B. Quinn to All Interested Parties, re: Initiation of Asia Wheel Scope Inquiry (Dep't Com. Mar. 22, 2021), P.R. 34. Commerce found that the original underlying investigation did not explicitly exclude wheels produced using mixed-origin components from the scope, and that the Orders are ambiguous as to the inclusion of wheels produced from mixed-origin inputs. See Final Scope Ruling at 14. As a

result, Commerce conducted a substantial transformation analysis based on the five factors outlined in Bell Supply IV. See 888 F.3d at 1228–29. Commerce concluded that the finished wheels processed in Thailand under Production Methods A and C are not substantially transformed, and that those wheels' country of origin is therefore China. See Final Scope Ruling at 26–36. On August 25, 2022, Commerce issued a Preliminary Scope Ruling, finding that Method A and C wheels are within the scope of the Orders, while Method B wheels are not. See Mem. from E. Begnal, to J. Maeder, re: Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Aug. 25, 2022), P.R. 100 ("Prelim. Scope Ruling").

Commerce issued its Final Scope Ruling on April 11, 2023, continuing to find that Method A and C wheels are within the scope of the Orders and that Method B wheels are not. See Final Scope Ruling at 54. Commerce then instructed Customs to continue to suspend liquidation of entries of Methods A and C wheels if liquidation was already suspended; for entries not subject to suspension, Commerce instructed Customs to suspend liquidation effective as of the March 22, 2021 initiation of the scope inquiry. See id. at 40.

### III.    Procedural History

Asia Wheel brought this action against the Government on June 8, 2023 to challenge Commerce's Final Scope Ruling. See Compl., June 8, 2023, ECF No. 11. Defendant-Intervenor and Plaintiff-Intervenor each moved to intervene in the instant action under USCIT Rule 24, and the court granted both motions. See Mot. to Intervene as Def.-Inter., July 7, 2023, ECF No. 14; Order, July 11, 2023, ECF No. 22; Mot. to Intervene as Pl.-Inter., July 10, 2023, ECF No. 18; Order, July 11, 2023, ECF No. 23.

On August 18, 2023, the parties filed a joint status report agreeing to consolidate separate actions initiated by Asia Wheel, Trailstar, Lionshead, and Dexter. See Joint Status Report, Aug.

18, 2023, ECF No. 26.  The court subsequently consolidated the four cases under Consolidated Court Number 23-00096.  See Order, Aug. 18, 2023, ECF No. 27.

On November 20, 2023, Plaintiffs together filed a Motion for Judgment on the Agency Record under USCIT Rule 56.2.  See Pls.' Br.  The Government and Defendant-Intervenor filed their respective response briefs on June 13 and June 27, 2023.  See Gov't Br.; Def.-Inter.'s Br. Plaintiffs filed a reply on July 31, 2023.  See Pls.' Reply.

With all papers filed, the court held oral argument on Tuesday, July 23, 2024.  See Order, June 14, 2024, ECF No. 59.  Prior to oral argument, the court issued, and the parties responded to, questions regarding the case.  See Letter re: Qs. for Oral Arg., July 8, 2024, ECF No. 63; Def.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 66; Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 67; Pls.' Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 68.  As directed by the court, the parties also filed briefs following oral argument.  See Def.'s Post-Arg. Br., July 30, 2024, ECF No. 73; Def.-Inter.'s Post-Arg. Br., July 30, 2024, ECF No. 74; Pls.' Post-Arg. Br., July 30, 2024, ECF No. 75.

The case was held in abeyance pending oral argument in a parallel case, Asia Wheel Co. v. United States, Consol. Ct. No. 23-00143 (USCIT filed July 14, 2023) ("Asia Wheel II").  See Order, Oct. 18, 2024, ECF No. 76.  That case involves a scope determination where Commerce considered wheels much like those here: those with components originating in China but where processing culminates in Thailand.  See Mem. from J. Pollack to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 9, Case No. A-570-082, Bar Code: 4386647 (Dep't Com. June 7, 2023).  The opinion in Asia Wheel II is being released concurrently with this opinion.  See Opinion, Asia Wheel II, Feb. 21, 2025, ECF No. 65.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). Section 1516a(b)(1)(B)(i) provides the standard of review: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  This standard requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 CIT 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the substantial-evidence standard).  Substantial evidence may support Commerce's determination even if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of drawing two inconsistent conclusions from the evidence.'"  Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

In issuing scope rulings in particular, Commerce has "substantial freedom to interpret and clarify its antidumping orders," leading to "significant deference to Commerce's interpretation of

a scope order." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013). However, the question of whether the scope set out in an original investigation is ambiguous such as to warrant substantial transformation analysis is reviewed by the court de novo. See Meridian Prods. LLC v. United States, 851 F.3d 1375, 1381 (Fed Cir. 2017).

## DISCUSSION

### I.     Commerce's Interpretation of the Orders Is Supported by Substantial Evidence and in Accordance with Law.

The text of the Orders here provides that "[t]he scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China." Orders, 84 Fed. Reg. at 45954. Plaintiffs argue that the word "and" in the phrase "rims and discs from China" is conjunctive such that only wheels consisting of both Chinese-origin discs and Chinese-origin rims fall within the scope. See Pls.' Br. at 19–20. Therefore, Plaintiffs maintain that the term "rims and discs from China" unambiguously excludes wheels produced from mixed-origin components. See id.

The Government and Defendant-Intervenor counter that the words "including, but not limited to" in the scope indicate "that the 'painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing," and point out that the "plain language does not address what varieties of processing may otherwise exclude a product from the scope." Gov't Br. at 12 (quoting Prelim. Scope Ruling at 13); see also Def.-Inter.'s Br. at 6–8. Therefore, the Government contends that the scope does not exclude Asia Wheel's wheels produced from mixed-origin components, and instead reflects that wheels produced from mixed-origin components are covered by the scope if

the "processing would not otherwise exclude these items had the processing occurred in China." Gov't Br. at 12 (quoting Prelim. Scope Ruling at 13).

Commerce's interpretation of the scope is supported by substantial evidence and in accordance with law because (1) "rims, discs, and wheels that have been further processed in a third country" may be reasonably interpreted to include wheels produced from mixed-origin components and because (2) Commerce's later statements only addressed wheels produced from Chinese components such that they did not contradict the earlier interpretation that wheels produced from mixed-origin components fall within the scope of the Orders. Orders, 84 Fed. Reg. at 45954.

### A. Commerce Did Not Err in Determining the Plain Language of the Orders Does Not Exclude Asia Wheel's Steel Wheels from the Scope.

The terms of an order govern its scope. See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1087 (Fed. Cir. 2002) ("[A] predicate for the interpretive process is language in the order that is subject to interpretation."); see also Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071–72 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). The first step in considering whether a product is within the scope of an order is to consider the language of the order itself. See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012). In analyzing the language of the scope, Commerce may also examine primary interpretive sources such as the descriptions of the merchandise in the petition and in the initial investigation, previous or concurrent determinations of the Secretary, and reports issued pursuant to the initial investigation. See 19 C.F.R. § 351.225(k)(1)(i). If the language of the order unambiguously covers or excludes a product, then that language governs Commerce's inquiry. See 19 C.F.R. § 351.225(k)(1); Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005).

"Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to include it." Duferco Steel, 296 F.3d at 1089. "[A]n interpretation that renders [a term in the scope language] meaningless and mere surplusage," is not reasonable. SMA Surfaces, Inc. v. United States, 47 CIT __, __, 617 F. Supp. 3d 1263, 1275 (2023) (internal quotation marks and citations omitted). Commerce "may reasonably define the class or kind of merchandise in a single set of orders," rather than "engage in a game of whack-a-mole" to specifically include every item of merchandise that could fall within an order in the language of that order. Canadian Solar, Inc. v. United States, 918 F.3d 909, 921–22 (Fed. Cir. 2019). "Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language, but it is not justifiable to identify an ambiguity where none exists." Allegheny Bradford Corp. v. United States, 29 CIT 830, 843, 342 F. Supp. 2d 1172, 1184 (2004) (citing Novosteel SA v. United States, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

The original scope language as laid out at the outset of the antidumping and countervailing investigations included "steel wheels, discs, and rims" imported from China. Certain Steel Wheels 12 to 16.5 Inches in Diameter From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation, 83 Fed. Reg. 45095, 45100 (Dep't Com. Sept. 5, 2018) ("Initiation of Investigation"). Commerce later modified this scope language to more explicitly include wheels that undergo further processing outside of China. In response to a proposal from Defendant-Intervenor on the issue of wheels processed in third countries, Commerce included a provision in its preliminary scope determination, and later its final scope determination, explicitly stating that "[t]he scope includes rims, discs, and wheels that have been further processed in a third country." Mem. from E. Begnal to G. Taverman, re: Preliminary Scope Decision Mem. at 7–8 (Dep't Com. Apr. 15, 2019), P.R. 1, 2, C.R. 1, 2, 3, 4, Attach. 2 ("Prelim. Scope Mem."); Final

Scope Ruling at 6. While this scope language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as "steel wheels . . . from China," and whose processing "would not otherwise remove the merchandise from the scope of the investigations if performed in [China]." Id.

Commerce also accepted Defendant-Intervenor's proposed example of further processing, noting that this provision "include[es], but [is] not limited to, the welding and painting of rims and discs to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China." Prelim. Scope Mem. at 5. Commerce added further clarifying language at the request of Asia Wheel, and ultimately included the following example of further processing in the final Orders: "the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel." Orders, 84 Fed. Reg. at 45954 (emphasis added).

Plaintiffs argue that this example, and in particular the phrase "rims and discs from China" indicates that wheels produced from mixed-origin components are unambiguously excluded from the scope. See Pls.' Br. at 19–20. However, the phrase "rims and discs from China" comes only after the phrase "including, but not limited to," indicating that "the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel" constitute two non-exclusive examples. The words "including, but not limited to" would be rendered meaningless if Commerce were to interpret the scope to unambiguously exclude wheels produced from mixed-origin components because they are not "rims and discs from China":

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any

> other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China.

Orders, 84 Fed. Reg. at 45954 (emphasis added); Def.-Inter.'s Br. at 5–6. "The court cannot accept an interpretation that renders [a term in the scope language] meaningless and mere surplusage." SMA Surfaces, 47 CIT at __, 617 F. Supp. 3d at 1275 (internal quotation marks and citation omitted). A nonexclusive example of third-country processing that would certainly not remove wheels from the scope still leaves open what other types of third-country processing would similarly not remove the merchandise from the scope of the investigation.

The phrase "including, but not limited to" indicates that there are methods of third-country processing that will fall within the scope of the Orders, even if not specifically outlined. Orders, 84 Fed. Reg. at 45954. The above excerpt from the Orders indicates that there are methods of processing that will be within the scope, though Commerce explicitly chose not to enumerate them all. To rule that any method of processing not explicitly outlined in the Orders is outside the scope would render certain key phrases superfluous. Therefore, this language does not, as Plaintiffs argue, indicate that wheels produced from mixed-origin components are unambiguously excluded from the scope.

The plain scope language includes rims, discs, and wheels that have undergone further processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China. While the scope language notes that "the painting of wheels from China and the welding and painting of rims and discs from China" are further processing that do not remove the merchandise from the scope, the scope language is ambiguous as to what other further processing would not remove the merchandise from the scope. Id. Therefore, Commerce did not err in determining that the scope language does not categorically exclude wheels produced from mixed-origin components.

### B.      Commerce's Scope Determination Did Not Change the Scope of the Orders.

Plaintiffs state that Commerce "confirmed in the original investigation that wheels manufactured in third countries with only one wheel component (rims or discs) originating in China are outside the scope." Pls.' Br. at 21. Thus, Plaintiffs argue, Commerce "recharacterized" its scope analysis from the antidumping and countervailing investigations by concluding that the scope of the Orders is ambiguous. Id. at 23. The Government counters that Commerce declined to modify the scope to expressly include wheels produced from rims or discs from China, but also "did not dictate that wheels manufactured from some other variation of Chinese rims or discs must be held to be out-of-scope." Gov't Br. at 14. Defendant-Intervenor further argues that "Commerce was explicit that its determination on this point addressed only 'the clarifying language in question,'" and therefore did not change the scope of the order or alter its express terms. Def.-Inter.'s Br. at 8.

"[A] scope determination is not in accordance with law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." Allegheny Bradford, 28 CIT at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95); see also Wheatland Tube, 161 F.3d at 1370 ("Although Commerce enjoys substantial freedom to interpret and clarify its antidumping duty orders, it can neither change them, nor interpret them in a way contrary to their terms." (internal quotation marks and citations omitted)). A clarification of scope language does "not change the scope of the order or alter its express terms." King Supply Co. v. United States, 674 F.3d 1343, 1351 (Fed. Cir. 2012) (distinguishing Duferco Steel on the ground that Commerce in that case "had impermissibly relied upon language in the petitions rather than the orders to modify the scope of the orders by effectively importing a physical description of certain products that was not present in the text of the order." (citation omitted)).

Commerce's statements during the investigation did not "recharacterize" or change the scope of the Orders, but rather confirmed the scope was ambiguous as to which types of third-country processing would not remove a product from the scope. Pls.' Br. at 23; see also Prelim. Scope Mem. at 8–11; Final Scope Mem. at 22–24. In refusing to accept suggested revisions from both Plaintiffs and Defendant-Intervenor, Commerce communicated that during the original investigation it would not address the inclusion of wheels produced from mixed-origin components. See Final Scope Mem. at 22–24 ("Commerce understood this clarification to address exactly the circumstance that was explicitly presented, the assembly (and surface finishing) of steel wheels in a third country from all constituent parts in China."). For example, Commerce's statement during the original investigation that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country" confirmed that the original investigation would not address wheels produced from mixed-origin components. See id. at 24.

As Plaintiffs point out, Commerce reiterated this position again at the conclusion of its analysis:

> [A]s we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and discs produced in China and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt further clarification language proposed in the respondent/importer's affirmative scope comments.

Id.

The term "existing language" refers to "the welding and painting of rims and discs from China to form a steel wheel," as it contains the term "rims and discs." Orders, 84 Fed. Reg. at 45954. As indicated above, this language provides a single, nonexclusive example of third-country processing that would certainly not remove wheels from the scope. This statement confirms only that that single, nonexclusive example does not include wheels produced from mixed-origin

components; it does not, as Plaintiffs suggest, confirm that wheels produced from mixed-origin components do not fall within scope. This is consistent with Commerce's intent to defer the question of wheels produced from mixed-origin components for later, case-by-case analysis. See Def.'s Br. at 15.

Commerce commentary in the Final Scope Memorandum responded to both Plaintiffs' and Defendant-Intervenor's attempts to gain a favorable scope ruling far along in the original investigation process. See Final Scope Mem. at 24 ("[T]he petitioner did not avail itself of previous opportunities to provide exclusionary language regarding the component parts of wheels."). Commerce had requested that all interested parties submit scope comments by September 17, 2018. See Initiation of Investigation at 45096. Neither Defendant-Intervenor nor Plaintiffs put forward proposed language changes to the third-country processing provision until early 2019. See Prelim. Scope Mem. at 3–4.

Instead of issuing a late-stage scope determination in the original investigation, Commerce's "agree[ed], generally, with the respondent/importer's understanding" pertaining only to wheels made with both Chinese discs and rims, while deferring the question of wheels produced from mixed-origin components to a later scope inquiry. See Final Scope Mem. at 24. This interpretation is also consistent with Commerce's other statements. For example, Commerce found "at this time, that the current scope language is clear that only if all constituent rims and disc parts to form a steel wheel are from China does the order apply notwithstanding any analysis of substantial transformation." Id. (emphasis added). Commerce also noted that substantial transformation analysis is a fact-specific inquiry, and that a sweeping decision for all wheels produced from mixed-origin components would accordingly be inappropriate. See Prelim. Scope Mem. at 9. These additional statements emphasize that Commerce spoke only to wheels produced

from Chinese-origin components rather than making a wholesale determination on the additional question of wheels produced from mixed-origin components.

The court concludes that Commerce's scope determination that the Orders did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the Orders and with Commerce's statements during the investigations. Therefore, Commerce's scope determination did not "change[] the scope of [the] order or interpret[] [the] order in a manner contrary to the order's terms." Allegheny Bradford, 28 CIT at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95). In lawfully determining that the scope of the Orders was ambiguous as to wheels produced from mixed-origin components, Commerce permissibly proceeded to conduct a substantial transformation analysis. See Bell Supply Co. v. United States, 39 CIT 948, 970, 83 F. Supp. 3d 1311, 1328 (2015) ("Bell Supply I") (finding that Commerce must first "interpret the actual words of an order when it conducts a scope inquiry" before conducting a substantial transformation analysis).

> II. **Commerce's Determination that the Mixed-Origin Components Were Not Substantially Transformed into Thai-Origin Wheels Is Supported by Substantial Evidence and in Accordance with Law.**

Plaintiffs argue that Commerce failed to apply the proper legal standard in conducting its substantial transformation analysis, and that Commerce's analysis is unsupported by substantial evidence. The court addresses each argument in turn and concludes that (1) Commerce's method of analysis is in accordance with law, and that (2) Commerce's analysis and subsequent conclusion that Asia Wheel's steel wheels were of Chinese origin is supported by substantial evidence.

> A. **Commerce's Five-Factor Method of Analysis Is in Accordance with Law.**

Recall that antidumping and countervailing orders apply based on the type of merchandise and the country of origin, and that in determining country of origin, Commerce may conduct a substantial transformation analysis. See Bell Supply IV, 888 F.3d at 1228, 1230. Substantial

transformation analysis is a metric to determine "whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (internal quotation marks and citation omitted).

Plaintiffs first contend that Commerce employed the incorrect test in performing its substantial transformation analysis. According to Plaintiffs, the "fundamental question" is whether the Chinese-origin components became "a new product having a new name, character and use," through Thai processing. Pls.' Br. at 27–28 (citing Bell Supply IV, 888 F.3d at 1228 (internal quotation marks and citations omitted)). Instead, Plaintiffs argue, Commerce "had it backwards," employing five factors noted in Bell Supply IV for determining whether substantial transformation had occurred as the primary test—disconnected from the fundamental question such that its analysis was "meaningless"—rather than using the factors to inform the "name, character, and use" question. See id. at 28–29 (citing Bell Supply IV, 888 F.3d at 1228–29). The Government contends that Commerce "may consider whether the third[-]country processing imparted 'a new name, character, and use' in consideration of the totality of the circumstances, [but] such [a] finding[] may not supplant analysis of the record with respect to the" five factor test. Gov't Br. at 21. The Government and Defendant-Intervenor also argue that implementation of this standard as the "sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot." Id. at 20–21 (quoting Final Scope Ruling at 28); see also Def.-Inter.'s Br. at 19–20.

Commerce's application of the five factors from Bell Supply IV, in analyzing whether the wheel components underwent substantial transformation in Thailand, is in accordance with law. See 888 F.3d at 1228–29. Recall that in Bell Supply IV, the Federal Circuit held that "[a]

substantial transformation occurs where, as a result of manufacturing or processing steps . . . [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." Id. at 1228 (internal quotation marks and citation omitted). According to the Final Scope Ruling, Commerce's substantial transformation analysis here asked:

> (1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use; and
>
> (2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.

Final Scope Ruling at 8 (footnotes omitted).

Thus, while Plaintiffs correctly note that whether a product "loses its identity and is transformed into a new product having a new name, character, and use" is relevant to the substantial transformation question here, this is not where the analysis ends. Pls.' Br. at 28 (quoting Bell Supply IV, 888 F.3d at 1228–29). Recall that the court in Bell Supply IV went on to posit five (nonexclusive) factors for the substantial transformation analysis:

> To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment.

888 F.3d at 1228–29.

Consequently, while a product's "new name, character[,] and use" may be relevant, the five-factor test is the primary mechanism for determining whether substantial transformation has occurred.[3] Additionally, the five-factor test is a "totality of the circumstances" method of analysis

---

[3] This court previously addressed the Federal Circuit's mention of a "new name, character[,] and use" in Bell Supply IV, noting that "[a]lthough the Court of Appeals quotes Bestfoods to invoke the name, character[,] or use test, Bestfoods involved a North American Free Trade Agreement country of origin determination applying statutory tariff-shift rules as opposed to

such that the factors are not "divorced" from the fundamental question, as Plaintiffs allege. See Venus Wire Indus. Pvt. Ltd. v. United States, 43 CIT __, __, 424 F. Supp. 3d 1369, 1378 n.11 (2019) ("While the formulation of the factors Commerce considers in a substantial transformation test varies slightly across proceedings, in general, Commerce considers [these five factors.]" (citing Bell Supply IV, 888 F.3d at 1228–29)). Accordingly, Commerce's thorough analysis of the five factors outlined in Bell Supply IV in determining whether Asia Wheel's steel wheels underwent substantial transformation in Thailand is in accordance with law.

> ### B.    Commerce's Substantial Transformation Analysis Is Supported by Substantial Evidence.

Plaintiffs next suggest that Commerce, in conducting its substantial transformation analysis, considered just one component (the rims for Method A wheels) rather than the finished wheel, thus failing to apply the governing legal standard. See Pls.' Br. at 29–30.[4] The Government contends that the court rejected a similar argument ten years ago in a case where it considered whether unfinished and finished parts from China were substantially transformed into finished products in Thailand. See Gov't Br. at 23 (citing Peer Bearing Co.-Changshan v. United States, 39 CIT 1942, 1963–64, 128 F. Supp. 3d 1286, 1304 (2015) ("Commerce was not precluded from taking into consideration the uncontested fact that the [tapered roller bearing] production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to

---

Gibson-Thomsen's 'name, character[,] and use' test, which evolved in Customs law." Bell Supply Co. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1281, 1287 n.6 (2018) ("Bell Supply V"). The Federal Circuit "[spoke] of the name, character or use test, [but did] not invoke any of the factors used in Customs cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation." Id. Because Commerce itself noted the new name, character, and use question within the Final Scope Ruling, the court considers it here just as courts did in Bell Supply IV and V: as secondary to the more essential five factors.

[4] Plaintiffs do not challenge Commerce's substantial transformation determination with respect to Method C wheels due to low U.S. shipment volumes. See Pls.' Br. at 27 n.4.

become [tapered roller bearings].")).

While the parties agree that one component (the rims for Method A wheels) of the subject merchandise is of Chinese origin, Plaintiffs' characterization ignores Commerce's thorough analysis of the wheel as a whole and the other component of the finished wheel (the disc in Method A wheels). The relevant question in Commerce's substantial transformation analysis was not whether the rectangular sheet of steel is substantially transformed when turned into a round rim in the case of Method A wheels. Rather, the question was whether <u>both</u> wheel components undergo substantial transformation to become a <u>finished wheel</u>. <u>See</u> Final Scope Ruling at 26–36. Thus, Commerce here asked whether an in-process component (a steel plate for Method A wheels) and a finished component (a disc for Method A wheels) are substantially transformed when processed and assembled into a finished wheel. Focusing only on the transformation from steel sheet to finished rim ignores the rest of the processing, much of which takes place in China: for example, the creation of the steel plate and the production of the finished disc for Method A wheels. But again, the relevant question was not whether the in-process component is substantially transformed when processed into a finished component (the steel sheet into a rim for Method A wheels), but rather whether the in-process component <u>and the finished component</u> are substantially transformed when processed and assembled into a <u>finished wheel</u>. <u>See</u> <u>id.</u>

Commerce's Final Scope Ruling demonstrates that the agency considered exactly this question at every stage of analysis. Contrary to Plaintiffs' contention that Commerce only considered a single component rather than the finished wheel, <u>see</u> Pls.' Br. at 30, Commerce found that: (1) the wheel components <u>and finished wheel</u> are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as the only such component after incorporation into <u>the finished wheel</u>, and (3) the production in China culminates

in a <u>complete component and an in-process component</u>, <u>functionally creating an already-designed wheel</u>. <u>See</u> Final Scope Ruling at 26–36. Commerce ultimately concluded that "<u>the finished wheels</u> processed in Thailand under Production Methods A and C are not substantially transformed such that the third-country processing confers country of origin based on the totality of circumstances." <u>Id.</u> at 26 (emphasis added). This conclusion is supported by substantial evidence, as Commerce thoroughly considered all five factors in analyzing whether the in-process component and the finished component are substantially transformed into a finished wheel in Thailand.

The Method A at issue, where the production in China culminates in one finished component and one in-process component, differ from the Method B wheels, where the production in China culminates in two in-process components. <u>Compare</u> Final Scope Ruling at 32, <u>with</u> Prelim. Scope Mem. at 15. Commerce reasonably found that because the Chinese manufacturing of Method A wheels results in one finished component and one in-process component, unlike Method B wheels, the processing in China "functionally results in an already designed wheel." Final Scope Ruling at 32. Additionally, though Commerce did not conduct substantial transformation analysis on Method B wheels, the value added in Thailand and the Thai investment in Method B wheels is presumptively higher than for Method A wheels, as more manufacturing is likely required to produce finished wheels from two in-process components rather than one finished component and one in-process component. Thus, Commerce reasonably determined that Method A wheels fall within the scope of the <u>Orders</u> while Method B wheels do not.

Plaintiffs suggest that Commerce's analysis of the "essential component" factor "further illustrates its flawed approach." Pls.' Br. at 30. To the extent that this argument serves as an example that Commerce only considered one component, it fails, as Commerce considered both

components and the finished wheel throughout its analysis. See Final Scope Ruling at 26–36. To the extent that this argument raises an independent ground for finding Commerce's substantial transformation analysis to be unsupported by substantial evidence, it also fails, as Commerce extensively considered the properties and end uses of both the rim and the disc and the finished wheel. See Final Scope Ruling at 27–28. In doing so, Commerce noted that, while the essential characteristics of the finished wheel are not established until the rim and disc are assembled, the elements remain the same both before and after assembly. Id. at 29. Commerce found that "a given disc or rim continues to function as the only such component after incorporation into a finished wheel." Id. at 28 (quoting Prelim. Scope Ruling at 18). Commerce considered, for example, that the qualities of a disc do not change or transform through processing: the number, placement, and type of bolt holes; the mounting arrangement; and the materials used to produce the disc all remain the same. See Prelim. Scope Ruling at 18. Additionally, Commerce noted that the introduction of certain physical characteristics in Thailand, like the rim's diameter, is merely the finishing of a process that began in China. See Final Scope Ruling at 32. Commerce thus "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action . . . ." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Commerce's finding is therefore supported by substantial evidence.

### III.    Commerce's Decision to Impose Duties on the Entire Wheel Is Supported by Substantial Evidence.

Plaintiffs also argue Commerce impermissibly expanded the scope contrary to its terms when it determined that the entire wheel is covered by the scope of the Orders when "only one wheel component . . . was exported from China . . . ." Pls.' Br. at 3, see also id. at 32. The Government counters that Plaintiffs begin the inquiry at the wrong point in the analysis, asking the court to determine whether some components of the wheel are not dutiable on their own when it

has been determined that the entire wheel is subject merchandise. See Gov't Br. at 24. Defendant-Intervenor further argues that "precedent confirms that Commerce's determination is to the origin of the imported article <u>as a whole</u>, not separately where its amalgamated components may have originated." Def.-Inter.'s Br. at 22.

While Plaintiffs are correct that Commerce cannot interpret the scope of the <u>Orders</u> to change the scope or otherwise interpret it contrary to its terms, that is not the case here. See Pls.' Br. at 32 (citing <u>Eckstrom Indus.</u>, 254 F.3d at 1072). Commerce did not change or expand the scope, but merely conducted a substantial transformation analysis to confirm that the wheels here are Chinese and therefore fall within the scope.

Plaintiffs' argument on this point is based on its mischaracterization of Commerce's substantial transformation analysis as concluding that only one component of the wheel was of Chinese origin. See Pls.' Br. at 29–30. As indicated above, this characterization overlooks Commerce's thorough analysis of both components and the finished wheel. Indeed, substantial transformation analysis assesses duty liability for a product assembled from multiple components upon its entry into the United States. See <u>Bell Supply IV</u>, 888 F.3d at 1229 ("Because a single article can be assembled from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries."). Subsequently, the substantial transformation analysis provides a metric "for determining whether the processes performed on merchandise in a country are of such significance as to require that the <u>resulting merchandise</u> be considered the product of the country in which the transformation occurred." Id. (internal quotation marks and citation omitted) (emphasis added). In conducting substantial transformation analysis, Commerce sought to determine the country of origin for the

resulting product as entered into the United States—that is, as an assembled wheel.

Plaintiffs do not provide any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess. To the extent the Plaintiffs suggest Commerce should follow this method separately from conducting a substantial transformation analysis, the suggestion is moot. As Commerce already determined the entire wheel is within scope, it need not assess duties on individual wheel components. Therefore, Commerce's imposition of antidumping and countervailing duties on the entire wheel is supported by substantial evidence.

**IV.     *Commerce Permissibly Directed Customs to Continue to Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry.***

Plaintiffs argue that importers did not receive fair warning that trailer wheels produced in third countries from mixed-origin components are subject to the Orders until Commerce initiated the scope inquiry at Asia Wheel's request. See Pls.' Br. at 34. Thus, Plaintiffs contend, Commerce impermissibly directed Customs to continue its prior suspension of liquidation of imports entered before the date of initiation of the scope inquiry. See id. This direction, according to Plaintiffs, will subject them to millions of dollars in retroactive antidumping and countervailing duties that they could not have anticipated. See Pls.' Br. at 3–4. The Government and Defendant-Intervenor counter that Commerce expressly noted during the underlying investigation that mixed-origin wheels may be the subject of a future scope inquiry and therefore provided adequate notice to importers of mixed-origin wheels. See Def.'s Br. at 30–31; Def.-Inter.'s Br. at 24–25. Even if Commerce did not provide adequate notice, the Government and Defendant-Intervenor argue, Commerce has no authority to direct the outcome of decisions that Commerce entrusted to Customs. See Def.'s Br at 34; Def.-Inter.'s Br. at 26–28; 19 U.S.C. § 1517(b)(1) ("[Customs] shall initiate an investigation if [Customs] determines that the information provided in . . . the

referral . . . reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.").

Upon an affirmative scope determination, Commerce will "direct U.S. Customs and Border Protection to continue the suspension of liquidation of previously suspended entries and apply the applicable cash deposit rate until appropriate liquidation instructions are issued . . . ." 19 C.F.R. § 351.225(*l*)(3). Additionally, Commerce "will direct U.S. Customs and Border Protection to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product not yet suspended . . . on or after the date of initiation of the scope inquiry . . . ." Id. Fair notice is particularly important in contexts like this one where importers may be subjected to substantial retroactive liability. The fair notice requirement reflects the "broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires.'" Tai-Ao Aluminum Co. v. United States, 983 F.3d 487, 495 (Fed. Cir. 2020) (quoting Mid Continent Nail, 725 F.3d at 1300–01).

Commerce's statements expressly "not foreclos[ing] a further analysis of substantial transformation" of mixed-origin components served as adequate notice. Final Scope Mem. at 24. Because Plaintiffs had adequate notice, Commerce permissibly directed Customs to continue its prior suspension of liquidation.

### A.    *Commerce Provided Lawful Notice That Mixed-Origin Wheels Could Be Subject Merchandise.*

An antidumping and countervailing duty order must contain "a description of the subject merchandise, in such detail as the administering authority deems necessary," to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). Adequate notice requires

"that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include." Mid Continent Nail, 725 F.3d at 1301 (internal quotation marks and citation omitted). Without adequate notice, "Commerce cannot suspend liquidation of entries entered 'on . . . the date of initiation of the scope inquiry.'" Tai-Ao, 983 F.3d at 490 (quoting 19 C.F.R. § 351.225(*l*)(2)). This notice requirement reflects the "broader due-process principle" that Commerce must provide fair warning to regulated parties before enforcing a penalty or sanction. Id. at 495 (quoting Mid Continent Nail, 725 F.3d at 1300–01).

However, adequate notice is not the same as certainty that a product will or will not fall within the scope of an order. Instead, adequate notice need only allow an importer to reasonably interpret what merchandise is included in the order. Cf. Mid Continent Nail, 725 F.3d at 1301–02 ("The mere fact that the order in this case makes no explicit reference to mixed media items does not conclusively establish that Commerce lacked authority to consider the order's applicability to nails contained within such items."). Notice need not be certain because questions often later "arise as to whether a particular product is covered by the scope of an antidumping or countervailing duty order. Such questions, such as those regarding the country of origin of merchandise, may arise for a variety of reasons given that the description of the merchandise subject to the scope is written in general terms." 19 C.F.R. § 351.225(a); see also Bell Supply Co. v. United States, 43 CIT __, __, 393 F. Supp. 3d 1229, 1236 (2019) ("Bell Supply VI") ("Issues arise regarding whether a product falls within the scope of an [antidumping or countervailing duty] order, in part because federal regulations require Commerce to write the descriptions in 'general terms.'"). Commerce may use a substantial transformation analysis to resolve questions regarding the country of origin of an imported article. See Bell Supply IV, 888 F.3d at 1229. The existence of some ambiguity in scope language does not mean that notice is inadequate as to products

requiring substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing. Cf. Canadian Solar, 918 F.3d at 921–22 ("It is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury.").

Here, Commerce explicitly included within the scope "rims, discs, and wheels that have been further processed in a third country," and provided two types of processing that would certainly be included (painting of Chinese wheels and welding and painting of Chinese rims and discs). Orders, 84 Fed. Reg. at 45954. However, by including "any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in China," Commerce left open the question of what other types of third-country processing would not remove merchandise from the scope. Id. While this language did not explicitly indicate that the exact processing here would be included, supra section I.A., it contained the general statement that rims, discs, and wheels processed in a third country may be included.

Even if the scope language itself was not enough to provide adequate notice on its own, Commerce went further. Commerce stated during the investigation that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Final Scope Mem. at 24. This statement further delineated the type of merchandise that was subject to the scope: "wheels completed in a third country from a mix of rim and disc parts from China and a third country" that did not undergo substantial transformation that would otherwise remove them from the scope. Id. Commerce cannot be expected to anticipate every type of third-country processing, and thus cannot feasibly indicate with certainty every hypothetical product that would fall within the scope.

Despite this ambiguity as to specific types of processing, Plaintiffs could anticipate that the wheels at issue fall within Commerce's description and thus are covered by the scope based on the language of the Orders and Commerce's commentary during the investigation. Therefore, Commerce's commentary during the investigation provided further adequate notice that wheels produced from mixed-origin components could be subject merchandise.

Plaintiffs argue that "Commerce gave importers the exact opposite of fair warning," by stating that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and diss produced in China." Pls.' Br. at 36; see also Final Scope Mem. at 24. However, in confirming that "the use of the limit phrase ('or'), is intentionally and selectively expansionary and not consistent with the plain meaning of the word 'and,'" Commerce merely confirmed that the single, nonexclusive example of wheels that would certainly fall within the scope is limited to wheels produced from Chinese rims and Chinese discs. Final Scope Mem. at 24. This confirmation does not, as Plaintiffs suggest, exclude any other wheels from the scope, such as wheels produced from mixed-origin components.

Along with this confirmation that the non-exhaustive example includes only wheels produced from Chinese rims and Chinese discs, Commerce importantly noted that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Final Scope Mem. at 24. In refusing to foreclose this further analysis, Commerce clearly contemplated the exact wheels at issue here such that Plaintiffs could reasonably anticipate that the wheels at issue would fall within the scope subject to a substantial transformation analysis. This express statement, along with the original scope language and third-country processing provision, provided importers with adequate notice.

> **B.**     ***Tai-Ao* and *Trans Texas* Do Not Support Plaintiffs' Argument that Commerce Failed to Provide Fair Notice Here.**

Plaintiffs provide two cases to support their assertion that Commerce's statements clarifying the original scope did not provide adequate notice. See Tai-Ao Aluminum Co. v. United States, 983 F.3d 487 (Fed. Cir. 2020); Trans Tex. Tire, LLC v. United States, 45 CIT __, 519 F. Supp. 3d 1275 (2021). However, those cases differ in important ways from the present case. In Tai-Ao, Commerce expanded the scope of its inquiry. See 983 F.3d at 495–96. In Trans Texas, Commerce did not suggest the relevant products were included in the scope until the final scope ruling. See 45 CIT at __, 519 F. Supp. 3d at 1281. Those cases are unlike the present case, where a reasonable importer could interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis. See Orders, 84 Fed. Reg. at 45954; Final Scope Mem. at 24.

Plaintiffs argue that Tai-Ao "confirms that statements of intent to consider the potential application of antidumping and countervailing duties in the future do not constitute fair warning." Pls.' Br. at 40. However, the court in Tai-Ao did not hold that a statement of intent can never provide adequate notice, but only that a statement of intent contemplating whether the inquiry should be expanded does not provide adequate notice. Tai-Ao, 983 F.3d at 495. This holding was supported by Commerce's statements and conduct suggesting the scope was limited to a single importer. For example, in Tai-Ao, the Initiation Notice only named one importer, Commerce's explanation for why it initiated the inquiry focused primarily on one importer, and Commerce issued a questionnaire to only one importer. See id. at 495–96. Unlike in Tai-Ao, where the statement of intent contemplated expansion of the scope and contradicted Commerce's other statements and conduct, Commerce's statement here that it would not "foreclose a further analysis

of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country," merely clarified the original scope and was consistent with Commerce's other statements and conduct. Final Scope Mem. at 24. Therefore, unlike in Tai-Ao, Commerce's statement here that it would not foreclose future analysis of wheels produced from mixed-origin components served as adequate notice that wheels produced from mixed-origin components could be included within the scope.

Trans Texas similarly does not support the Plaintiffs' argument that Commerce did not provide adequate notice here. See 45 CIT __, 519 F. Supp. 3d 1275. In Trans Texas, Commerce expressly excluded certain on-the-road steel wheels that are coated entirely in chrome from its preliminary determination and reiterated this position throughout the investigation. Id. at __, 1281. However, Commerce ultimately included PVD chrome wheels in its final scope ruling despite their being coated in chrome. See id. While the court confirmed that Commerce can "alter the scope of the investigation until the final order," Commerce did not alter the scope to include PVD chrome wheels until publication of the final scope ruling, and thus did not provide adequate notice until then. Id. at __, __, 1284, 1288. This is unlike the present case where wheels produced from mixed-origin components can reasonably be considered within the original scope and where Commerce expressly indicated they might be included subject to a substantial transformation analysis during the initial investigation. See Final Scope Mem. at 24.

Ultimately, Commerce's initial scope language, Commerce's addition of the third-country processing provision, and Commerce's express statements during the investigation that it would not foreclose future substantial transformation analysis of wheels produced from mixed-origin components provided Plaintiffs with adequate notice that their wheels could reasonably be subject

to the <u>Orders</u>.   Because Commerce provided Plaintiffs with adequate notice, Commerce's instructions to Customs to continue its prior suspension of liquidation were proper.

### CONCLUSION

For the reasons stated above, Commerce's determination is supported by substantial evidence and in accordance with law.  The court thus denies Asia Wheel's motion and sustains Commerce's Final Scope Ruling.  Judgment will enter accordingly.

**SO ORDERED.**

/s/      *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>February 21, 2025</u>
New York, New York